**Winifred DIEMER, et al., Appellants,**

**v.**

**Brick Upton DIEMER, Sr., et al., Appellees.**

**No. B14–85–643–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 28, 1986.

Rehearing Denied Oct. 2, 1986.

Russell P. Austin, Houston, for appellants.

Sidney Levine, Eugene Pitman, De-Lange, Hudspeth, Pitman & Katz, Larkin C. Eakin, Jr., Jackson, Jackson & Eakin, Houston, for appellees.

Before PAUL PRESSLER, SEARS and CANNON, JJ.

OPINION

SEARS, Justice.

This appeal from a declaratory judgment involves the construction of the will of B.P. Diemer and the will and codicil of his wife, Dora Diemer. The trial court determined that appellant James Scott Diemer, natural son of appellant Winifred Diemer and adopted son of Ted Diemer, deceased, was not entitled to take a testate interest pursuant to the terms of B.P. Diemer's will. However, the court held that appellant James Scott Diemer was entitled to take a testate interest pursuant to the terms of Dora Diemer's will and codicil. Appellants challenge that portion of the trial court's findings construing B.P. Diemer's will, bringing four points of error. Appellees complain of that portion of the judgment construing Dora Diemer's will and codicil in a single cross-point. We affirm the judgment of the trial court *in toto*.

B.P. Diemer's will is dated February 7, 1956. He died on June 6, 1959. The disputed paragraph the trial court was asked to construe provides the following:

Subject to Paragraph 5 above [involving the distribution of mineral interests of no consequence here], it is my desire and I so direct that the real property owned by me shall pass to and vest in my heirs, as follows:

A. It is my desire that the 35 acre lake, known as the Gin House Lake, on the Dillard Place, shall be jointly held by my beloved daughters, Elizabeth Diemer Malin and Thyra Diemer Dixon, and their descendants, jointly, with right of ingress and egress from and to said lake over the lands now owned by me and given to either of my daughters under this Will.

B. It is my desire and I so direct that the farms known as the Clara Sterling place and the Dillard Place shall pass to and vest in my beloved daughter, Elizabeth Diemer Malin, for and during her natural life, and at the death of my said daughter I give, devise and bequeath the same to her descendants, in fee simple.

C. It is my desire and I so direct that the farm known as the Home Place, which was formerly the J.C. Diemer place, which I bought from Will Sterling, shall pass to and vest in my beloved daughter, Thyra Diemer Dixon, for and during her natural life, and at the death of my said daughter I give, devise and bequeath the same to her descendants, in fee simple.

D. It is my desire and I so direct that the farm known as the Garrett Place shall be divided into two equal portions, with the line of division running North and South, and that the East half of said farm shall pass to and vest in my beloved son, Upton Diemer, for and during his natural life, and at the death of my said son I give, devise and bequeath the same to his descendants, in fee simple.

E. It is my desire and I so direct that the West one-half of the Garrett Place, divided as above stated, shall pass to and vest in my beloved son, Ted Diemer, for and during his natural life, and at his death, to his descendants, in fee simple. In the event that my beloved son, Ted Diemer, should die without *issue*, then, and in that event, upon his death, the property herein bequeathed to him shall be divided into three equal portions, one share to go to the issue of Elizabeth Diemer Malin, one share to go to the issue of Thyra Diemer Dixon, and one share to go to the issue of Upton Diemer, share and share alike (emphasis added).

The language of Paragraph 6E presents the conflict in this case. Appellants urge in their first three points of error that the court should have permitted James Scott Diemer to inherit the west one-half of the Garrett Place after Ted Diemer's life estate was terminated. Appellants argue that the language of B.P. Diemer's will unequivo-

cally indicates his intent to include adopted children, since the instrument contains no language limiting the term "descendants" to those related by blood to Ted Diemer. Therefore, appellants conclude that Ted Diemer's adopted son should be included in the class of remaindermen entitled to take at the termination of Ted Diemer's life estate. We are not persuaded by appellants' arguments.

■ It is well settled that the basic rule for courts in interpreting wills is to determine the intent of the testator. *Lehman v. Corpus Christi National Bank,* 668 S.W.2d 687 (Tex.1984); *Gee v. Read,* 606 S.W.2d 677 (Tex.1980). If the will itself is unambiguous, courts should not go beyond its specific terms in search of the testator's intent. *Frost National Bank v. Newton,* 554 S.W.2d 149 (Tex.1977). "The duty of the Court is to construe the will from the words used therein.... The intent must be drawn from the will, not the will from the intent." *Huffman v. Huffman,* 161 Tex. 267, 339 S.W.2d 885, 888 (1960). Both appellants and appellees agree that the terms of the B.P. Diemer's will are unambiguous. Our duty, then, is to determine his intent from the terms of the instrument.

Paragraph 6 of the will disposes of B.P. Diemer's real property. In essence, he bequeathed each of his four children a life estate in certain real property. All of the children, with the exception of Ted Diemer, had natural children. The remainder of the property was to go to each of the testator's children's descendants in fee simple. For three of B.P. Diemer's children, the remainder interest to their descendants was all that B.P. Diemer felt obliged to mention. For his son Ted, however, who had no natural children, B.P. Diemer felt it necessary to add the above-quoted language concerning the contingency of Ted Diemer's dying without "issue."

By changing the terminology from "descendants" to "issue" in Ted Diemer's bequest, we believe B.P. Diemer expressed an intent that only blood relatives of Ted Diemer be included in the class of remaindermen. Further, we believe it was B.P. Diemer's intent that, should Ted Diemer die without blood relations, then only those blood relations of B.P. Diemer's other children would be permitted to share in the remainder interest of Ted Diemer's life estate. The only time B.P. Diemer used the term "issue" was in his bequest to Ted Diemer, his only child without natural children. It therefore has special meaning and was not intended to be used interchangeably with "descendants."

■ When construing the language of a will, the court is obliged to give the words used by the testator their ordinary and commonly understood meaning, unless a contrary intent is clearly expressed. *White v. Taylor,* 155 Tex. 392, 286 S.W.2d 925 (1956), and authorities cited therein. In the ordinary and usual sense, the term "issue" clearly connotes a blood relationship. *See Cutrer v. Cutrer,* 162 Tex. 166, 345 S.W.2d 513, 517 (1961), and cases there cited. *See also* Black's Law Dictionary 712 (5th ed. 1979). Although the term is not as strong a word of limitation as are "heirs of the body," it is nevertheless· a word of limitation—one that we believe, in construing the language of the will, B.P. Diemer intended to invoke in order to exclude adopted children from taking as remaindermen. *Compare Vaughn v. Gunter,* 458 S.W.2d 523 (Tex.Civ.App.—Dallas), *writ ref'd n.r.e. per curium,* 461 S.W.2d 599 (Tex.1970). If this had not been his intent, the above-quoted language following his bequest to Ted Diemer would have been unnecessary. Appellants' first three points of error are therefore overruled.

By way of cross-point of error appellees allege that the trial court erred in construing the will and codicil of Dora Diemer to include adopted adults in the class of remaindermen. Appellees contend that Dora Diemer intended to include only adopted minor children in the class, not adopted adults. The will of Dora Diemer is identical in terms to that of B.P. Diemer. However, on July 26, 1960, Dora Diemer executed a codicil to her will. She died on July

23, 1963. Dora Diemer's codicil provided in pertinent part as follows:

(D) In the event my son, Ted Diemer and his wife, Otilla Costley Diemer, each survive me, I give and devise jointly unto my son and his wife, Otilla Costley Diemer, so long as each one survives me, and upon the death of either, then to the survivor (whichever one survives the other), for and during the remainder of the natural life of such survivor, or unto my said son, Ted Diemer, for and during his natural life, or unto his wife, Otilla Costley Diemer, for and during her natural life, should either one predecease me and the other survive me, the West one-half of the aforesaid lands generally known as the "Garrett Place" (that is, lands in said tract, subject to the aforesaid mineral estate devise); and I give and devise the remainder estate in said lands (including oil, gas, sulphur and other minerals therein, subject, however, to the aforesaid mineral estate devise) unto the children, per stirpes, of my said son; in event my said son and his wife each predecease me, and I am survived by children, or issue of children, of my said son, I then give and devise unto the children, per stirpes, of my said son, the aforesaid lands, together with the minerals therein, subject to the aforesaid mineral estate devise; hereby intending that upon termination of said mineral estate devise (at death of the last survivor of my said children), as aforesaid, the minerals in said lands shall thereupon revert and vest as herein directed.

The use of the term "child" or "children," in either of the foregoing devises, insofar as same applies to issue of either of my *children*, shall be understood to mean natural issue, or *legally adopted children* of either of my said children (emphasis added).

■ Otilla Costley Diemer, mentioned specifically in Paragraph D of Dora Diemer's codicil, was Ted Diemer's first wife.

She died in 1962. In 1964, Ted Diemer married appellant Winifred Diemer, the mother of James Scott Diemer. Winifred Diemer's son was twenty-three years old when he was adopted by Ted Diemer on February 26, 1968. While these facts may have some bearing on the status of the life estate in the bequeathed west one-half of the Garrett Place by Dora Diemer, they have little to do with determining the testatrix's intent when the subsequent paragraph concerning the definition of "children" was written. The language of this paragraph is clear and unambiguous. We believe the intent of Dora Diemer is clearly expressed by that language. Dora Diemer could not have intended, as appellees argue, to limit the term "legally adopted children" to mean only legally adopted minors because she used the very same terminology, *i.e.,* "children," to describe her own sons and daughters, none of whom were minors when the codicil was executed. Considering the unambiguous terms of the codicil itself, we hold that appellees' crosspoint is without merit and accordingly overrule it.

■ In their fourth point of error appellants complain that the trial court erred in failing to award appellants attorney's fees. Section 10 of the Uniform Declaratory Judgments Act, Tex.Rev.Civ.Stat.Ann. art. 2524-1 (Vernon Supp.1985) *, permits the court, in its discretion, to award reasonable and necessary attorney's fees for cases falling within the purview of the act. The trial court awarded attorney's fees only to the appointed attorney ad litem. Since neither plaintiffs (appellants) nor defendants (appellees) wholly prevailed in the court below, we find no abuse of discretion in the court's failure to award attorney's fees to either party. *Contact Products v. Dixico,* 672 S.W.2d 607 (Tex.App.—Dallas 1984, no writ). Appellant's fourth point of error is overruled.

---

* Article 2524–1 has been repealed. It is recodified in Chapter 37 of the Texas Civil Practice and Remedies Code (Vernon Supp.1986). Section 37.009 provides: "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."

The judgment of the trial court is affirmed.